**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

MATTHEW AND KAYLYNE NEWELL,

      Appellants,

      v.

PIERCE COUNTY,

      Respondent.

No. 86162-0-I

DIVISION ONE

UNPUBLISHED OPINION

MANN, J. — In Washington, a legal nonconforming use is a use that "lawfully existed" before a change in zoning regulations and is allowed to continue even though it no longer complies with current zoning. A protected nonconforming status generally grants the right to continue the existing use but will not grant the right to significantly change, alter, extend, or enlarge the existing use.

Before purchasing property in Tacoma, Washington, Matthew and Kaylyne Newell (Newells) inquired with Pierce County Department of Planning and Land Services (the County) whether a nonconforming contractor yard use previously granted on the property would allow Newell to operate a dump truck business. The planner confirmed a nonconforming use was approved for the property in 2004. At that time, the nonconforming use was a "contractor yard" consisting of an excavation business along

with one dump truck and one backhoe. The Newells purchased the property and proceeded to operate at least five semi-trailer dump trucks dispatched from the property to deliver materials. After neighbor complaints about increased noise, dust, and traffic, the County initiated an enforcement action asserting that Newell was operating an unauthorized delivery truck fleet.

The Newells appealed and the hearing examiner affirmed the enforcement action determining that the Newells' actual use was as a central dispatch and servicing of a delivery truck fleet. The Newells appealed the decision in Pierce County Superior Court under the Land Use Petition Act (LUPA), ch. 36.70C RCW, and brought additional tort claims against the County. The trial court disagreed with the hearing examiner and granted the Newells' LUPA appeal. Additionally, the trial court granted summary judgment on the tort claims in favor of the County. On appeal to this court, the Newells argue the hearing examiner's decision is not supported by substantial evidence, is an erroneous interpretation of the law, and is a clearly erroneous application of the law to the facts. The Newells also argue summary judgment dismissal of their tort claims was error.

We affirm the trial court's dismissal of the Newells' tort claims. We reverse the trial court's decision on the LUPA appeal and affirm the hearing examiner's decision.

I

A

The Newells own real property at 12603 34th Avenue, Tacoma, Washington (the property), located in the Mid-County Community Plan area and zoned as Rural Separator (RSep). The Newells purchased the property from Boyd and Bette Malyon

-2-

(Malyons) who owned the property since at least 1978. The property includes a single-family residence and a 4,000 square foot shop. Two construction companies have operated on the site, one established in 1977 and one established in 1994. When those companies were established, the property was in the general zone classification and a contractor yard was a permitted use. In 1995, the zone classification was amended to RSep. Contractor yards are not allowed in the RSep zone.

The Malyons' use of the property and potential violation of the RSep zoning was first documented by the County in 2004. In December 2004, Stefan Kamieniecki, an associate planner with the County, wrote the Malyons to confirm their existing nonconforming use. The 2004 letter provided in part:

> Current zoning for your parcel is Rural Separator (RSep). This zone does not allow a business such as a contractor's yard in any form. However, when you stated that you began your business approximately 26 years ago the zoning was General (G) and would have allowed a business such as yours in the G zone.
>             . . . .
> You have established to my satisfaction that your business has continued uninterrupted since 1978 and that all required permits for the parcel have been obtained.
>
> Therefore, <u>your business</u> is considered a legally established nonconforming use in the [RSep] zone classification.

 (Emphasis added.)

In 2013, the County initiated an enforcement action after the Malyons expanded the size of the yard space by grading in close proximity to a creek—a designated critical area. The County eventually withdrew the enforcement action after the expansion was pulled back from the creek. In 2019, the County planning staff noted that an expansion of a nonconforming use permit should have been required for the expanded yard space.

In late August 2018, the Newells e-mailed County associate planner Dan Buhl, seeking information about the approved nonconforming use, and whether it would transfer with sale. The Newells explained that they operated a "dump truck company" but did not have a contractor license, so they needed to know whether a dump truck license would satisfy the zoning requirements. Buhl responded on September 4, 2018:

> As long as the use has been continuous since the [2004 letter] was written, there are still non-conforming rights. Please be aware there are very special circumstances about expanding a non-conforming use. Below is the special note in our use matrix for areas zoned RSep in Mid-County concerning contractor yards:
>
> "Only legally existing contractors yards formerly designated. . . . shall be allowed to remain and expand. . . . expansions shall require approval of an Administrative Use Permit."

In mid-September 2018, Newell and Buhl had the following e-mail exchange:

> [E-mail from Newell to Buhl]:
>
> If I purchase this land with the shop and house for my dump truck company, Newell Brothers Inc, is this nonconforming status transferrable to me? [Malyon] has continued to run his excavating and dump truck business there and is still doing business as a contractor. There will not be a lapse in operating a business except the short time it would take to move.
>
> [Reply e-mail from Buhl]:
>
> As long [as] they have continually run the business since the date the non-conforming use was determined, you would be able to continue the use if you take ownership. Again, you could not expand the use without an Administrative Use Permit, but you can run the business in the same area the business currently operates.

(Emphasis added).

The Newells purchased the property in January 2019 for $971,859.80.

On March 8, 2019, a citizen complaint was filed with the County over noise and traffic issues with a trucking business on the property. The County sent the Newells a public service request inquiry concerning a land use and/or public nuisance issue on the property. County code enforcement officer Jason Arbogast visited the property and took pictures from the public right of way and discussed with staff whether the traffic was consistent with the contractor yard approved in the 2004 letter. On July 11, 2019, Arbogast closed the March 8 noise and traffic complaint because "trucks observed had been found compliant with the [2004 letter] and the current zoning." But, a week later, the inquiry was transferred to associate planner Roy Hoffmann and assigned a new case number to research whether there had been an expansion of the contractor yard approved in 2004.

In August 2019, Barney Phillips, a neighbor, contacted a Pierce County councilmember regarding activity on the site:

> For your info, the trucking outfit at 12603 34th Avenue has added 2 more trucks for a total now of 14. He had told a neighbor he intends to double the number when he had 12 and he is on his way to doing that. He is pretty much out of room on the north side and the only place he can park more trucks will be in the field on the south side. The intersection at 128th and 34th Ave is showing some wear from the constant traffic of these trucks. Noise has also increased with repairs to the equipment.

On September 6, 2019, Hoffmann issued a notice and order to correct (NOTC) letter for an expansion of the yard without required permits. The Newells appealed and the NOTC was later rescinded.

Meanwhile, the County continued to receive complaints from neighbor Phillips:

> I have been here for over 36 years, before the mentioned property was purchased by Boyd and Bette Malyon. Once the Malyons built their home they also built a metal building for their dump truck. We rarely heard the

dump truck run as he would start it in the building or along the south side where there were some evergreen and deciduous trees. He was respectful of the neighbors and tried to create as little impact as possible. In that respect it remained a very quiet neighborhood until the current owner moved in.

When Newell Brothers moved in they had 5 trucks and, months later he has added 2 more trucks to his growing fleet. In short time more trucks arrived, these were trucks from other companies that he is, as I have been informed, renting/leasing space to. There are now a dozen trucks on site. Sometimes more appear and sometimes a couple less. One is the former owner's dump truck. Some days there is a lot of traffic from many companies dropping off and picking up trailers. The truck traffic from and to the property can be overwhelming at times.

Phillips went on to describe noise from the business as early as 3:00 a.m., the addition of several trucks at the site with various company names, and fueling activity occurring until 10:00 p.m. or later.

Subsequently, Hoffmann took photos of the trucks on site and researched the business. Hoffmann looked up various websites, such as the Washington Secretary of State Corporations and Charities Division, which classified the Newells' business as "transportation & warehousing."

On January 6, 2020, Hoffmann sent an inquiry letter to the Newells about a request to investigate an alleged additional business operating at the site based on the observations by County staff of eight or more parked large semi-trucks with open air trailers. The letter provided the use definitions for contractor yard and warehousing, distribution, and freight movement from the Pierce County Code (PCC) 18A.33.280 along with clarifying notes:

The large trucks appear to be operating as a delivery fleet . . . some of the trucks have company names on them. . . . A delivery truck fleet. . . .is not a permitted use.
  . . . .

Explanatory Note: The key difference with truck use in [the contractor yard] category is to support the delivery of construction materials used in conjunction with specific construction projects.

. . . .

Explanatory Note: Delivery trucks within [warehousing, distribution, and freight movement] category involve delivery/distribution of materials (raw or processed) from one vendor to another.

On June 25, 2020, the County issued a NOTC for operating a delivery truck fleet business and provided the relevant definition in PCC 18A.33.280.I, and the following:

Staff observed 7 or more large commercial trucks exceeding 18,000 gross vehicle weight . . . there may be nonconforming rights to operate a contractor yard use (using smaller weight trucks/vehicles and a smaller yard area) occurring on the parcel as well.

. . . .

The Department's position is that the larger trucks . . . are being used as a delivery truck fleet business and are not supporting on-site nonconforming contractor yard use.

The County provided the Newells with three options to potentially cure the violation: (1) permanently remove all commercial trucks not related to on-site contractor yard use, (2) if asserting the large semi-truck delivery business is replacing the contractor yard use then it is necessary to apply for a site specific information letter which will be reviewed for compliance with PCC 18A.70.050.A, or (3) if through a successful appeal the larger trucks are deemed part of contractor yard use, the County asserts the intensity of use is more than a 10 percent expansion of the use outlined in the 2004 letter and thus an administrative use permit (AUP) is needed for the expanded use.

B

On July 9, 2020, the Newells appealed to the Pierce County Hearing Examiner's Office denying any violation. The hearing was conducted on February 18, 2021.

-7-

Stephen Shelton presided as the hearing examiner. Hoffmann and Matt Newell testified, along with neighbors Barney Phillips and Tom Freudenstein.

Hoffmann's testimony was inconsistent about the distinction between contractor yard use and delivery truck fleet. He testified that when he observed the trucks on site he could not tell whether they had been used to deliver materials, raw or processed, from one vendor to another. Hoffmann described the trucks he observed as having a "semi front" and being very long with a "metal C shape." Hoffmann testified that Malyon's declaration, described below, did not provide enough information to make a determination of the use from the declaration alone.

Phillips testified that he lived next to the Newells' property since 1983 and observed Malyon's business of hauling dirt and gravel from the property which was low impact because Malyon used one dump truck and one backhoe. He testified that he observed no material on the property since Newell started operating and "all they have is empty trucks. They start at 4:00 o'clock in the morning." Phillips testified that when the Newells first moved in, there were five trucks plus Malyon's dump truck and he has since added more for a total of 14 trucks. During the summer months, Phillips observed some of the trucks had other company names on them and some would park overnight or for extended periods of time. He observed no loading or material handling on the property but that the trucks were serviced on site. When asked if the trucks with other company names were still on site, he confirmed that they hadn't been there for several months. When asked if the Newells' business changed from when it came on site, Phillips answered the business more than doubled in size—they first came in with the

five trucks. The other neighbor present at the hearing, Freudenstein, agreed with Phillips's testimony.

Matt Newell testified that his company subcontracts to deliver aggregate to job sites using dump trucks and side dumps, including spreading it out if required, along with exporting off projects. Newell confirmed that no other equipment is used, only the dump trucks. Newell also confirmed the trucks are dispatched by his brother who is at another location, but that the trucks come and go from and are serviced on the property. Additionally, Newell stated that if the County had recorded a lis pendens or any kind of notice of violation that would show in a title report, he would not have completed the purchase of the property.

Hearing exhibit A-28 was the declaration of Boyd Malyon describing his use of the property prior to the sale to the Newells:

> 2. My wife Bette and I owned the above described property, prior to sale to the Newells.
>
> 3. The work I did on site included but was not limited to storing and using dump truck to haul materials in support of construction projects.
>
> 4. I also had a backhoe for excavating, loading and transporting.

C

On June 17, 2021, the hearing examiner entered findings of fact and conclusions of law, denying the Newells' appeal. The hearing examiner concluded that a legal nonconforming use was granted to the property in 2004 for a contractor yard that utilized a portion of the property for storage of material and one dump truck that was used to haul material and equipment to job sites. Conclusion of law 3 states:

> The County granted a legal non-conforming use for a contractor yard on the Appellants' property in 2004 to a former owner who had a construction business and who utilized a portion of the property for storage of material and 1 dump truck which he used to haul equipment and materials to his construction jobs. The County acknowledged continued use of the property as a contractor yard in 2013 during an enforcement action against the former owner for an unlawful expansion of the yard.

The hearing examiner confirmed that the Malyons' contractor yard business was recognized by the County in 2013 during an enforcement action for an unlawful expansion on the property. The hearing examiner then determined that the neighbor complaints were based on a significant increase in impact to the neighborhood due to a significant change in the use of the property. The subsequent investigation by the County showed that the Newells' sole business was a trucking company that transported materials and not a contractor yard.

The hearing examiner determined that in the prepurchase e-mails between Buhl and Newell, Buhl was clear that the Newells' use must be consistent with the past usage to maintain nonconforming status. As to Arbogast's determination that the Newells' use was compliant in 2019, the hearing examiner determined that Arbogast was only considering the usage as to whether the nonconforming use was being expanded. The hearing examiner concluded it would be unreasonable to conclude that Buhl and Arbogast considered the actual use occurring at the site—solely to park and service 13 or more semitrucks with trailers to transport materials for other contractors 7 days a week from early morning to late evening. As for Hoffmann's inconsistent testimony, the hearing examiner noted that Hoffmann clarified his testimony once he was able to review the Newells' documents. Additionally, the hearing examiner agreed

-10-

with Hoffmann's testimony that Malyon's declaration did not provide sufficient detail to make usage determinations.

The hearing examiner concluded that the Newells' current use of the property was different than the Malyons' 2004 use of the property as a contractor yard. The hearing examiner concluded that the Newells' use instead met the definition of a central dispatch facility. Conclusion of law 11 states:

> In considering the testimony, exhibits, findings and conclusions, the County was able to prove by a preponderance of evidence that the Appellants operated the Newell Brothers trucking company on their property consistent with PCC 18.A.33.280I "as a central dispatch and servicing of a delivery truck fleet, where no reloading (transfer facility), warehousing, or consolidation of materials takes place on site" which is a use not permitted in the Rural Separator Mid-County Community Plan (RSep Mid-County) zoning designation of their property.

The hearing examiner denied the Newells' appeal.

D

After unsuccessfully moving for reconsideration, the Newells petitioned for review of the hearing examiner's decision by the Pierce County Superior Court. By stipulation, the trial court bifurcated the negligent misrepresentation damages cause of action to be taken up after a ruling on the LUPA matter. On March 25, 2022, the trial court granted the Newells' LUPA appeal.

On April 14, 2022, the Newells amended their petition to allege an additional claim of deprivation of rights in violation of 42 U.S.C. § 1983, and sought compensatory or punitive damages.

-11-

On April 22, 2022, the County appealed the trial court's LUPA decision to Division Two of this court and moved for discretionary review. Division Two stayed the matter while final judgment was pending on the tort claims.

On May 6, 2022, the Newells moved for partial summary judgment on the civil rights claim and argued that given the trial court's LUPA ruling, the denial of their existing protected property right violated substantive due process. The County cross moved for summary judgment on the civil rights claim arguing that the Newells were afforded notice and an opportunity to be heard. The County also argued the negligent misrepresentation claim should be rejected because there was no specific assurance given that the Newells could expand their business.

The trial court granted the County's motion for summary judgment and dismissed all of the Newells' tort claims with prejudice. The court entered a final order noting that all claims were resolved. The Newells filed a notice of appeal to Division Two.

On August 5, 2022, the County amended its notice of appeal to include the trial court's order resolving all claims. After the pending motion for discretionary review was dismissed as moot, the case was transferred to this court for review.

II

Judicial review of land use decisions is governed by LUPA. Lauer v. Pierce County, 173 Wn.2d 242, 252, 267 P.3d 988 (2011). This court may affirm or reverse the land use decision under review or remand it for modification or further proceedings. RCW 36.70C.140. LUPA sets forth six standards for relief from an administrative land use decision. RCW 36.70C.130. The Newells seek relief under the following:

-12-

> (a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;
> (b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;
> (c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;
> (d) The land use decision is a clearly erroneous application of the law to the facts.

RCW 36.70C.130(1).

In reviewing a land use decision, this court stands in the same position as the superior court and reviews the administrative record. Phoenix Dev., Inc. v. City of Woodinville, 171 Wn.2d 820, 828, 256 P.3d 1150 (2011). Standards (a) and (b) present questions of law that this court reviews de novo. Phoenix Dev.,171 Wn.2d at 828. RCW 36.70C.130(1)(b) does not require a court to give complete deference to the local jurisdiction's interpretation of the law, but rather "such deference as is due." Wash. State Dep't of Transp. v. City of Seattle, 192 Wn. App. 824, 838-39, 368 P.3d 251 (2016).

"The substantial evidence standard of review, under standard (c), requires the court to determine whether a fair-minded person would be persuaded by the evidence of the truth of the challenged findings." Lauer, 173 Wn.2d at 252-53. When reviewing a challenge to the sufficiency of the evidence we view facts and inferences in a light most favorable to the party that prevailed in the highest forum exercising fact-finding authority. Phoenix Dev., 171 Wn.2d at 828-29. In this case, the County. This court does not weigh evidence or substitute its judgment on the evidence. Phoenix Dev., 171

Wn.2d at 832.  The burden of proof is on the party challenging the decision of the hearing examiner.  RCW 36.70C.130(1).  In this case, the Newells.

"[U]nder standard (d), a decision is clearly erroneous if, 'although there is evidence to support it, the reviewing court on the record is left with the definite and firm conviction that a mistake has been committed.'"  Lauer, 173 Wn.2d at 253 (quoting Phoenix Dev., 171 Wn.2d at 829).  Unchallenged findings of fact are verities on appeal.  Seven Hills, LLC v. Chelan County, 198 Wn.2d 371, 384, 495 P.3d 778 (2021).

III

A legal nonconforming use is a use that "lawfully existed" before a change in zoning regulations and is allowed to continue even though it no longer complies with current zoning.  Rhod-A-Zalea & 35th, Inc. v. Snohomish County, 136 Wn.2d 1, 6, 959 P.2d 1024 (1998).

> The theory of the zoning ordinance is that the nonconforming use is detrimental to some of those public interests (health, safety, morals or welfare) which justify the invoking of the police power.  Although found to be detrimental to important public interests, nonconforming uses are allowed to continue based on the belief that it would be unfair and perhaps unconstitutional to require an immediate cessation of a nonconforming use.

Rhod-A-Zalea, 136 Wn.2d at 7 (citing State ex rel. Miller v. Cain, 40 Wn.2d 216, 220-21, 242 P.2d 505 (1952)).

Our Supreme Court has recognized that "nonconforming uses limit the effectiveness of land-use-controls, imperil the success of community plans and injure property values."  Rhod-A-Zalea, 136 Wn.2d at 8.  Thus, nonconforming uses are generally disfavored and Washington courts have routinely held that the doctrine is a narrow exception to the state's power to regulate land.  King County, Dep't of Dev. &

Env't Servs. v. King County, 177 Wn.2d 636, 646, 305 P.3d 240 (2013). "A protected nonconforming status generally grants the right to continue the existing use but will not grant the right to significantly change, alter, extend, or enlarge the existing use." Rhod-A-Zalea, 136 Wn.2d at 7.

As we summarized in McMilian v. King County:

local governments are motivated to allow nonconforming uses to persist in order to avoid constitutional challenges to zoning ordinances. However, while "[a]s a general proposition, due process prevents the abrupt termination of what one had been doing lawfully[,] [t]he protection does not generally extend beyond this purpose."

161 Wn. App. 581, 592-93, 255 P.3d 739 (2011) (footnote omitted) (quoting Meridian Minerals Co. v. King County, 61 Wn. App. 195, 212, 810 P.2d 31 (1991)).

IV

An applicant asserting a nonconforming use bears the initial burden to prove "(1) the use existed before the county enacted the zoning ordinance; (2) the use was lawful at the time; and (3) the applicant did not abandon or discontinue the use for over a year." First Pioneer Trading Co., Inc., v. Pierce County, 146 Wn. App. 606, 614, 191 P.3d 928 (2008). The Newells argue that the hearing examiner erred in not concluding that they met their burden to establish that their current use of their property is a valid lawful nonconforming use. We disagree.

Pierce County defines "nonconforming use" as "a use or activity that was lawful prior to the adoption, revision or amendment of the comprehensive plan or development regulation but that fails by reason of such adoption, revision, or amendment to conform to the present requirements of the comprehensive plan or development regulation."

PCC 18.25.030. "Use" is defined as "the purpose or activity for which land or buildings are arranged, or intended, or for which land or buildings are occupied or maintained." PCC 18.25.030.

A

The first questions before us are whether there was a valid nonconforming use established on the Newell property, and, if so, what was that nonconforming use? The hearing examiner answered both questions in conclusion of law 3. The hearing examiner concluded that as of 2004 there was a legal nonconforming use on the property, and the use was as a contractor yard that was used for storage of material and one dump truck used to haul equipment and materials to construction jobs.

Other than characterizing conclusion 3 as an incorrect and "anemic" description of the scope of the nonconforming use, the Newells fail to challenge the basis for the hearing examiner's conclusion. It is undisputed that Malyon testified by declaration that his use of the property, prior to sale to the Newells in 2019, was for storage and operating a dump truck to haul materials in support of construction projects, as well as operating a backhoe for excavating, loading, and transporting materials. Malyon's declaration was supported by the neighbors' testimony that Malyon had one dump truck and one backhoe and stored materials on site. This is consistent with the County's use history that the Malyons operated an excavation business.

The hearing examiner's description of the nonconforming use is supported by substantial evidence. The hearing examiner did not err by concluding the legal

-16-

nonconforming use approved at the property was for storage of material and one dump truck used to haul equipment and materials to construction jobs.[1]

B

The Newells next argue that the hearing examiner erred because no evidence shows the Newells changed the use at the property from the nonconforming contractor yard approved in 2004. We disagree.

1

The Newells assign error to the hearing examiner's findings of fact 13, 14, 15, 17, and 19. Because each of these findings are supported by substantial evidence, we disagree. Finding 13 provides:

> 13. . . . On August 21, 2019, an entry in the Case Summary Report noted that there were several questionable issues that needed to be investigated and talked about to decide if enforcement action was warranted or not.

The Newells argue that this portion of finding 13 is misleading by omission because the "questionable issues" were whether the original nonconforming use had been expanded. But finding 13 is supported by the case summary report entry by Arbogast, which reads: "Hoffmann and I met to discuss if enforcement action will be warranted in this case . . . there are several questionable issues that need to be investigated . . . before reaching that conclusion."

The Newells challenge the portion of finding 14 that states:

> 14. . . . On November 4, 2019, the County rescinded the Notice to the Appellants, apparently, because the County had closed the 2013 enforcement action against the Malyons when the violation was corrected.

---

[1] And the County does not dispute that Newell could operate on the site for exactly that nonconforming use.

The Newells argue that the County rescinded the 2019 NOTC because the County was aware that the 2013 enforcement action against the Malyons had been closed. It is not clear in the record why the County rescinded its 2019 enforcement action against the Newells for expanding the nonconforming use. But the 2019 expansion enforcement is not before us and the finding has no bearing on whether there is substantial evidence supporting the hearing examiner's conclusion that the Newells' current actual use was a change from the originally approved nonconforming use.

The Newells assigns error to the portion of finding 15 that states:

15. . . . Unlike the low impact on the neighborhood from Mr. Malyon's contractor business and yard when he had one dump truck, the Appellants impact on the neighbors increased upon moving in with five semi-trucks creating more traffic, noise, exhaust, vibrations and dust starting at about 4:30 AM five days a week and sometimes earlier and also continuing on weekends when the trucks are being washed. These impacts have continued to increase as more trucks were located on the property and as of November 13 there were 12 trucks, some times more or less, on site operating 24/7.

The Newells argue that finding 15 is not supported by substantial evidence because the County did not bring its enforcement action for an expansion of use, but a new use. Therefore, the Newells contend, any expansion of trucks is irrelevant. But the Newells' argument goes to the law—not the factual basis of the finding. Finding 15 accurately summarizes the information in the e-mail from Phillips to the County and in Phillips's testimony.

The Newells also assign error to finding 17 which states:

17. On December 31, 2019, Mr. Hoffmann received an email from Mr. Phillips providing more detail on the truck companies who have or had trucks on the Appellants property in addition to the Malyon and Newell Brothers: Wolf Brothers, Parker's, Harlow Trucking, Barrett's Trucking and

Different View.  He also stated that a Christensen Fuel truck comes in
during the week between 8 to 9 PM and fuels trucks until 10 PM or later.

The Newells argue that finding 17 reflects only a snapshot in time and is misleading by omission.  But finding 17 is an accurate summary of Phillips's e-mail and is supported by Phillips's testimony.

Finally, the Newells challenge finding 19 which states:

Mr. Hoffmann conducted an internet search of Newell Bothers and confirmed the business being "Transportation & Warehousing", having a USDOT number, advertising for truck driver jobs through Truckdrivingjob.com, a page in Quick Transport Solutions Inc as a Washington Transport Company and an active carrier, a Company Snapshot noting USDOT number and cargo carried as "General Freight," a Linkedin page for Matt Newell noting history in transportation and trucking, and an L&I Workers Comp calculation of having in "Quarter 2 of Year 2020 "11-20 Workers".

But other than assigning error to finding 19, the Newells offer no argument demonstrating any defect.  Finding 19 is supported by the exhibits attached to the County's staff report.

2

The Newells argue that there is no evidence to support the hearing examiner's conclusion that the Newells changed the use of the property from the nonconforming contractor yard approved in 2004, to a delivery truck fleet use.  We disagree.

The PCC defines the use of a "Contractor Yard" as:

Contractor Yards Use Type refers to an area for construction or contracting business offices, interior or outdoor storage, repair, or maintenance of heavy equipment, vehicles, or construction supplies and materials.

PCC 18A.33.280.B.  In contrast, the PCC defines the use of Warehousing, Distribution, and Freight Movement as:

> Warehousing, Distribution, and Freight Movement Use Type refers to the large scale warehousing and distribution of manufactured or processed products for one or more businesses, the large scale distribution of raw, manufactured, or processed products for one or more businesses at a central location, <u>and the central dispatch and servicing of a delivery truck fleet, where no reloading (transfer facility), warehousing, or consolidation of materials takes place on site.</u> Materials may be stored inside a building or in outdoor storage areas.

PCC 18A.33.280.I (emphasis added).

The interpretation of a municipal ordinance is a question of law reviewed de novo. Ellensburg Cement Prods., Inc. v. Kittitas County, 179 Wn.2d 737, 743, 317 P.3d 1037 (2014). We construe a municipal ordinance according to the rules of statutory interpretation. Ellensburg Cement, 179 Wn.2d at 743. Our objective is to ascertain and give effect to the legislature's intent. Ellensburg Cement, 179 Wn.2d at 743. We look first to the text of a statute to determine its meaning. Griffin v. Thurston County Bd. of Health, 165 Wn.2d 50, 55, 196 P.3d 141 (2008). Where the meaning of statutory language is plain on its face, the court must give effect to that plain meaning as an expression of legislative intent. City of Spokane v. Spokane County, 158 Wn.2d 661, 673, 146 P.3d 893 (2006).

The Newells argue there is no evidence of a "delivery truck fleet" use. A fleet is defined as a group of trucks operated under unified control.[2] The Newells have at least five semi-trailer dump trucks and or side dumps as supported by evidence from Phillips, testimony by Matt Newell, and as determined in unchallenged conclusion 4. It is undisputed that the Newells use trucks to deliver materials. Matt Newell testified the

---

[2] MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/fleet (last visited Oct. 28, 2024).

trucks are dispatched from and are serviced on the property. Phillips testified that no loading or handling of materials takes place at the property and this testimony was not refuted by Newell. Additionally, the nature of the Newells' business is classified as "transportation & warehousing" by the Washington Secretary of State.

Our role "is not to determine whether evidence may support one decision over another" but to determine whether there is enough evidence to persuade a fair-minded person that the Newells' use is consistent with the definition of a central dispatch and servicing of a delivery truck fleet. Phoenix Dev., 171 Wn.2d at 832. Based on the evidence and viewed in the light most favorable to the County, there is substantial evidence supporting the hearing examiner's conclusion.

3

The Newells argue that the hearing examiner erred by applying the definition of the warehousing, distribution, and freight movement use in PCC 18A.33.280.I. This is so, they contend, because that definition was adopted in 2006—after the approval of the Malyon's nonconforming contractor yard in 2004. Newell's argument appears to miss the point of the hearing examiner's conclusion. The hearing examiner concluded first, that the Newells no longer used the property consistent with the use approved in 2004. The hearing examiner instead concluded that the Newells' current use better fit the definition of a different use—a warehousing, distribution, and freight movement use—a use prohibited in the RSep zone. The Newells are bound to comply with current county laws and regulations unless their use matches the nonconforming use approved in 2004. See Rhod-A-Zalea, 136 Wn.2d at 12.

The hearing examiner did not err by relying on PCC 18A.33.280.I to identify a change in use.

4

The Newells argue that the hearing examiner erred by failing to recognize that a nonconforming use may intensify. The Newells rely on Kitsap County v. Kitsap Rifle & Revolver Club, 184 Wn. App. 252, 268, 337 P.3d 328 (2014) for support. We disagree.

"Under Washington common law, nonconforming uses may be intensified, but not expanded." City of Univ. Place v. McGuire, 144 Wn.2d 640, 649, 30 P.3d 453 (2001). Our Supreme Court explained in Keller v. City of Bellingham, 92 Wn.2d 726, 731, 600 P.2d 1276 (1979):

> When an increase in volume or intensity of use is of such magnitude as to effect a fundamental change in a nonconforming use, courts may find the change to be proscribed by the ordinance. Intensification is permissible, however, where the nature and character of the use is unchanged and substantially the same facilities are used. The test is whether the intensified use is "different in kind" from the nonconforming use in existence when the zoning ordinance was adopted.

(Citations omitted.)

In Kitsap Rifle, the Kitsap county code prohibited expansion of the area of the nonconforming use and prohibited any alteration or enlargement of the nonconforming use. 184 Wn. App. at 270-71. Division Two of this court relied on Keller to interpret the county code as prohibiting expansion but not intensification. Kitsap Rifle, 184 Wn. App. at 272.

Under Pierce County's code, nonconforming uses shall not be enlarged, expanded, extended, replaced, or altered except as expressly permitted in chapter 18A.70 PCC. PCC 18.A.70.030.A. Pierce County allows a nonconforming use to

change to another nonconforming use of equal or lesser intensity and will consider, when determining intensity, the impacts including traffic, size and scale, noise, glare, dust, and hours of operation. PCC 18A.70.050. Any expansion of use may be allowed in limited percentages such as 5 percent outright, or 10 percent for an industrial nonconforming use with and approved AUP. PCC 18A.70.040.

Here, unlike in Kitsap Rifle, the PCC addresses expansion and intensification. The County's position, as shown in the NOTC, appears to be that the term expansion includes intensification and that the Newells' business exceeds the allowed 10 percent increase. The County gave the Newells three choices: (1) remove all commercial trucks and return the property to the previously approved contractor yard; (2) if the Newells contend they are changing use then apply for site specific information letter; (3) or if through a successful appeal it was determined that the larger trucks were part of a contractor yard, then the use had intensified and the Newells are required to apply for an AUP.

The hearing examiner did not fail to consider intensification.

Based on the foregoing, and because we view facts and inferences in favor of the County, we conclude substantial evidence supports the hearing examiner's decision.[3]

---

[3] Newell seeks relief under RCW 36.70C.130(1)(f) but other than assigning error, Newell does not argue the land use decision violates Newell's constitutional rights. "We will not consider an inadequately briefed argument." Norcon Builders, LLC v. GMP Homes VG, LLC, 161 Wn. App. 474, 486, 254 P.3d 835 (2011).

V

The Newells argue the hearing examiner erred by not equitably and judicially estopping the County from bringing the enforcement action.  The Newells assert equitable estoppel applies to County action here because (1) the County's position that dump truck use qualifies as a contractor yard is inconsistent with its current position, (2) the Newells acted in reliance upon the County's representation and purchased the property, (3) the Newells would be injured by County's current position that their use is not allowed, (4) estoppel is necessary to prevent manifest injustice, and (5) estoppel will not impair governmental functions because the County was content to allow dump truck use for over 30 years.

Conversely, the County argues that (1) any prior statements were not inconsistent with its current position and the Newells did not make it clear what their actual use would be, (2) the Newells present insufficient evidence of an injury, (3) the Newells fail to provide support that estoppel is necessary to prevent a manifest injustice, and (4) the Newells fail to show estoppel will not impair the County's ability to enforce the zoning code.  We agree with the County.

"Equitable estoppel prevents a party from taking a position inconsistent with a previous one where inequitable consequences would result to a party who has justifiably and in good faith relied."  Silverstreak, Inc. v. Wash. State Dep't of Labor & Indus., 159 Wn.2d 868, 887, 154 P.3d 891 (2007).  "When equitable estoppel is asserted against the government, the party asserting estoppel must establish five elements by clear, cogent, and convincing evidence: (1) a statement, admission, or act by the party to be estopped, which is inconsistent with its later claims, (2) the asserting

party acted in reliance upon the statement or action, (3) injury would result to the asserting party if the other party were allowed to repudiate its prior statement or action, (4) estoppel is "necessary to prevent a manifest injustice," and (5) estoppel will not impair governmental functions." Silverstreak, 159 Wn.2d at 887. Under this burden of proof, the trier of fact must be convinced the fact in issue is "highly probable." Kramarevcky v. Dep't of Soc. & Health Servs., 122 Wn.2d 738, 744, 863 P.2d 535 (1993).

Here, planners Buhl and Hoffmann made statements to the Newells confirming the County approved a nonconforming use on the property in 2004 and that the Newells could continue the approved use—the business as operated by Malyon—but that any expansion would require a permit. That is consistent with the County's current position, that operating as Malyon did is an approved nonconforming use, but expansion or change to operate multiple dump trucks is not a conforming use. Additionally, as to injury, the Newells simply say injury would result but fail to explain how. As for manifest injustice, the Newells state estoppel is plainly necessary without explaining why. Lastly, the Newells fail to argue how estoppel will not impair governmental functions other than to say that allowing the Malyons' use did not impair governmental functions.

The Newells failed to establish the five elements of equitable estoppel by clear, cogent, and convincing evidence. The hearing examiner did not err.[4]

---

[4] The Newells also argue in the alternative, that they were innocent purchasers under PCC 18.25.030 and enforcement should be barred. The Newells' argument is sparse and provides little beyond reciting the code provision. Thus, we decline to address this issue as improperly briefed. Palmer v. Jensen, 81 Wn. App. 148, 153, 913 P.2d 413 (1996) ("Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration.").

VI

The Newells argue the trial court erred by dismissing their claim of negligent misrepresentation on summary judgment. The Newells contend that the County was negligent in communicating false information which they relied on in purchasing the property. The Newells assert the undisputed record shows that the County had a special relationship with them. The Newells rely on Meaney v. Dodd, 111 Wn.2d 174, 759 P.2d 455 (1988) and Rogers v. City of Toppenish, 23 Wn. App. 554, 596 P.2d 1096 (1979). Conversely, the County argues no special relationship was created because there was no specific inquiry by the Newells, and no express assurance was given to Newell. We agree with the County.

Summary judgment is properly granted when the pleadings, affidavits, depositions, and admissions on file demonstrate there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); Folsom v. Burger King, 135 Wn.2d 658, 663, 958 P.2d 301 (1998). The burden is on the party moving for summary judgment to demonstrate there is no genuine dispute as to any material fact and reasonable inferences from the evidence must be resolved against the moving party. Folsom, 135 Wn.2d at 663. The motion should be granted only if, from all the evidence, a reasonable person could reach only one conclusion. Folsom, 135 Wn.2d at 663. An appellate court engages in the same inquiry as the trial court when reviewing an order for summary judgment. Folsom, 135 Wn.2d at 663. Appellate review is de novo. Folsom, 135 Wn.2d at 663.

"Every negligence action requires a showing of 'a duty of care running from the defendant to the plaintiff.'" Woods View II, LLC v. Kitsap County, 188 Wn. App. 1, 26,

352 P.3d 807 (2015) (quoting Honcoop v. State, 111 Wn.2d 182, 188, 759 P.2d 1188 (1988)). "Traditionally, regulatory statutes and municipal laws impose duties on public officials owed to "the public as a whole" and not to specific individuals." Mull v. City of Bellevue, 64 Wn. App. 245, 251, 823 P.2d 1152 (1992) (citing Meaney, 111 Wn.2d at 177). Thus, under the public duty doctrine, a government entity will not be liable for negligence unless the entity owes a duty to the plaintiff as an individual, rather than to the public in general. West Coast, Inc. v. Snohomish County, 112 Wn. App. 200, 207, 48 P.3d 997 (2002).

An exception to the public duty doctrine is a special relationship. West Coast, 112 Wn. App. at 207. A special relationship arises where (1) there is direct contact between the public official and the injured plaintiff which sets the latter apart from the general public, (2) there are express assurances given by a public official, and (3) those assurances give rise to justifiable reliance on the part of the plaintiff. West Coast, 112 Wn. App. at 207. The second element requires that incorrect information is clearly set forth by the government and the government intends that it be relied upon. Meaney, 111 Wn.2d at 180. And any express assurance given by the government must be unequivocal. Meaney, 111 Wn.2d at 180.

In Meaney, a sawmill owner's building application indicated the sawmill would create a minimal increase in noise and at no time prior to permit issuance did the owner inform the County of the specific noise level at which the mill would operate. 111 Wn.2d at 176. The owner was told that his application complied with all applicable codes. Once operating, the sawmill was in violation of noise regulations. Meaney, 111 Wn.2d at 180. Our Supreme Court concluded that no special relationship was established

because the county was entitled to rely on the owner's representation and had no duty to verify the owner's statements. Meaney, 111 Wn.2d at 180-81. Additionally, the owner did not ask expressly about noise and could not rely on the permit as assurance that the sawmill would comply with noise regulations. Meaney, 111 Wn.2d at 180. The court distinguished Rogers, and determined there was no evidence of a specific inquiry or misrepresentation by the county. Meaney, 111 Wn.2d at 181.

In Rogers, Rogers asked a city building inspector whether an apartment could be built on a property he was planning to purchase. 23 Wn. App. at 555. The inspector told Rogers the property was zoned for an apartment. Rogers purchased the property and the city issued him a building permit. Later, the city manager advised Rogers that only single-family residences or duplexes were permitted and Rogers's building permit was rescinded. The inspector argued that Rogers had no right to rely on the informal opinion of the inspector. Because both the zoning map and the city records confirmed apartments were never allowed, the court found there was a negligent representation of a material fact upon which Rogers relied to his damage. Rogers, 23 Wn. App. at 554. The inspector "had a duty as the administrator of the zoning ordinances to inform accurately an individual member of the public the zoning classification concerning specific real property once the inquiry and its purpose were made known." Rogers, 23 Wn. App. at 558.

Here, the parties agree there was direct contact between the Newells and the County. But the Newells fail to establish a specific inquiry that set them apart from the general public, or that the County gave express unequivocal assurances. The Newells' inquiry was more like that in Meaney. The Newells asked the County whether their

"dump truck company" would be able to operate under the nonconforming use established by the Malyons. The Newells did not follow up with specific questions as to expansion or what type of dump truck business would comply with the approved nonconforming use or whether an AUP would be necessary given the specifics of their business. It was the Newells' responsibility to comply with codes, regulations, and ordinances. Meaney, 111 Wn.2d at 179.

And, unlike in Rogers, the County gave accurate information to the Newells when it said that as long as Malyon's use was continuous the nonconforming rights remained. The County continued, however, by cautioning "be aware there are very special circumstances about expanding a nonconforming use." In a follow-up e-mail, the County again warned that

> As long [as] they have continually run the business since the date the nonconforming use was determined, you would be able to continue the use if you take ownership. Again, you could not expand the use without an Administrative Use Permit, but you can run the business in the same area the business currently operates.

(Emphasis added.)

Nothing said by the County was a direct misstatement of fact. The County specifically stated the Newells had to operate the same business or use in the same area as the Malyons. It was the Newells that assumed that their actual use qualified as the same business or use. "It is only where a direct inquiry is made by an individual and incorrect information is clearly set forth by the government, the government intends that it be relied upon and it is relied upon by the individual to his detriment, that the government may be bound." Meaney, 111 Wn.2d at 179.

-29-

The trial court did not err by granting summary judgment in favor of the County on the negligent misrepresentation claim.[5]

We affirm the trial court's dismissal of the Newells' tort claims. We reverse the trial court's decision on the LUPA appeal and affirm the hearing examiner's decision.[6]

_Mann, J._

WE CONCUR:

_Birk, J._                    _Chung, J._

---

[5] Because we agree with the County on the LUPA claim, we do not address Newell's civil rights claim for damages under 42 U.S.C. § 1983. See Mercer Island Citizens for Fair Process v. Tent City 4, 156 Wn. App. 393, 232 P.3d 1163 (2010) (claims for damages based on a LUPA claim must be dismissed if the LUPA claim fails).

[6] The Newells seek attorney fees on appeal. Because the Newells do not prevail, they are not entitled to attorney fees.